# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ANTHONY D. SLAYTON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06cv00070 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Anthony D. Slayton, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2007).  Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

Case 2:06-cv-00070-PMS   Document 15   Filed 09/28/07   Page 1 of 26   Pageid#: 86

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Slayton protectively filed his current application for SSI on January 14, 2004, alleging disability as of January 14, 2004,[2] based on a compression fracture in his lower back, degenerative disc disease and arthritis of the back, shoulders and elbows. (Record, ("R."), at 73-75, 82, 111.) Slayton's claim was denied both initially and on reconsideration. (R. at 58-60, 63-64, 65-67.) Slayton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 68.) The ALJ held a hearing on October 13, 2005, at which Slayton was represented by counsel. (R. at 30-45.)

By decision dated December 1, 2005, the ALJ denied Slayton's claim.[3] (R. at

---

[2]Slayton's alleged onset date was amended to January 14, 2004, from October 9, 2003, at the hearing. (R. at 34.)

[3]Slayton filed a prior application for SSI on July 1, 2002, and for Disability Insurance Benefits, ("DIB"), on July 10, 2003. (R. at 14.) Apparently, these two claims were consolidated for hearing. (R. at 14.) By decision dated October 8, 2003, the ALJ denied Slayton's claims. (R. at 14.) Slayton did not fully pursue his appeal rights. (R. at 14.) Thus, this prior decision is

Case 2:06-cv-00070-PMS   Document 15   Filed 09/28/07   Page 2 of 26   Pageid#: 87

14-22.)  The ALJ found that Slayton had not engaged in substantial gainful activity since January 14, 2004. (R. at 21.)   The ALJ found that the medical evidence established that Slayton had severe impairments, namely low back pain, history of L1 compression fracture, degenerative changes of the thoracic and lumbar spines and an emotional disorder with a Global Assessment of Functioning, ("GAF"), score of 55,[4] but he found that Slayton did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19, 21.)   The ALJ further found that Slayton's allegations regarding his limitations were not totally credible. (R. at 21.)  The ALJ found that Slayton had the residual functional capacity to perform medium work.[5]  (R. at 22.)  Thus, the ALJ found that Slayton could return to his past relevant work as a waterproofing worker, a painter and a warehouseman.  (R. at 22.)  Therefore, the ALJ concluded that Slayton was not under a disability as defined in the Act, and that he was not eligible for SSI benefits. (R. at 22.)  *See* 20 C.F.R. § 416.920(f) (2007).

---

*res judicata.*  Normally, in this situation, the relevant question before the court would be whether Slayton was disabled at any time between October 9, 2003, the day following the previous denial, and December 1, 2005, the date of the current ALJ's denial.  However, given that Slayton amended his alleged onset date to January 14, 2004, the relevant question before the court is whether Slayton was disabled at any time between January 14, 2004, and December 1, 2005.  I note that any medical evidence included in this Memorandum Opinion not directly relevant to this time period is included for clarity of the record only.

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

[5]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can perform light work, he also can perform light and sedentary work.  *See* 20 C.F.R. § 416.967(c) (2007).

-3-

After the ALJ issued his opinion, Slayton pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 6-9.) Slayton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2007). The case is before this court on Slayton's motion for summary judgment filed May 31, 2007, and the Commissioner's motion for summary judgment filed June 19, 2007.

## *II. Facts*

Slayton was born in 1959, (R. at 34, 73), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). He obtained his general equivalency development, ("GED"), diploma, and he has past relevant work experience as a general laborer, a roofer's helper, a waterproofer, a painter and a warehouseman. (R. at 34, 83, 88.)

Slayton testified at his hearing that he was unable to work due to lower back pain that radiated into his left leg and foot. (R. at 35.) He also testified that he experienced back spasms. (R. at 36.) He stated that these problems began when he broke his back while doing construction work. (R. at 38-39.) He estimated that he could walk 100 to 200 yards without interruption. (R. at 36.) Slayton testified that his pain varied from day to day. (R. at 36.) Slayton also testified that he suffered from depression, for which he took medication and saw various mental health professionals. (R. at 36-37.) Slayton testified that he became anxious around crowds of people and could not deal with the public. (R. at 37.) He stated that, in the past, he would fish and throw horseshoes, but he could no longer do so due to pain. (R. at 37.) He stated that he did not leave his house unless required. (R. at 38.)

-4-

Cathy Sanders, a vocational expert, also was present and testified at Slayton's hearing. (R. at 42-44.) Sanders classified Slayton's past work as a general maintenance worker as heavy[6] and unskilled and as a waterproofer as at least medium/heavy and unskilled. (R. at 42.) Sanders was asked to consider a hypothetical individual of Slayton's age, education and work history who could perform medium work, but who could perform jobs consistent with a GAF score of 55 due to an emotional disorder. (R. at 42.) Sanders testified that if the GAF score of 55 was interpreted to result in a moderate impairment, then the individual would be able to perform jobs existing in significant numbers in the national economy, including those of a janitor/cleaner, a nonconstruction laborer, a hand packager, a materials handler, a sorter, a groundskeeper and a vehicle washer, all at the light[7] and medium levels of exertion. (R. at 43.) However, Sanders testified that if the GAF score of 55 was interpreted to result in moderately severe impairments, then there would be no jobs that such an individual could perform. (R. at 43.) Sanders next testified that an individual with the limitations set forth in Spangler's evaluation would not be able to perform any jobs. (R. at 44.)

In rendering his decision, the ALJ reviewed records from Lee County Public Schools; Dr. Jai K. Varandani, M.D.; Lee County Community Hospital; Dr. Fred Litton, M.D.; Holston Valley Medical Center; Dr. Larry Carson, M.D.; Dr. John B. Raff, M.D.; Lonesome Pine Hospital; Lee Regional Medical Center; Dr. Harold

---

[6]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 416.967(d) (2007).

[7]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2007).

Schultz, D.O.; Dr. D. Gary Parrish, M.D., a state agency physician; Dr. F.M. Johnson, M.D., a state agency physician; Frontier Health; R.J. Milan Jr., Ph.D., a state agency psychologist; Stone Mountain Health Services; Robert S. Spangler, Ed.D., a licensed psychologist; Dr. R. Michael Moore, M.D.; Dr. Larry Hartman, M.D.; Karen Schooler, B.A.; Constance Douglas, A.P.R.N.; Dr. Zafar Ahsan, M.D., a psychiatrist; Dr. William McIlwain, M.D.; and Dr. Gregory Corradino, M.D.

The record reveals that Slayton saw Dr. Harold Schultz, D.O., on August 6, 2003, for a follow-up on complaints of back pain. (R. at 408.) At that time, Dr. Schultz noted that Slayton could not tolerate anti-inflammatories. (R. at 408.) Slayton rated his back pain at that time as an eight on a 10-point scale, with 10 being the worst pain. (R. at 408.) He further described a right elbow injury. (R. at 408.) A physical examination revealed that Slayton was alert and fully oriented. (R. at 408.) His motor and sensory functions were grossly intact. (R. at 408.) Dr. Schultz noted tenderness on palpation of the lumbar spine and pain in the right elbow. (R. at 408.) Dr. Schultz diagnosed low back pain, major depressive disorder, generalized anxiety disorder, insomnia and pain in the right elbow. (R. at 408.) He prescribed Flexeril, Elavil, Xanax and Lortab. (R. at 408.)

On February 5, 2004, Slayton presented to the emergency department at Lee Regional Medical Center with complaints of pain and swelling to the right elbow and left calf after falling. (R. at 415-22.) He was diagnosed with acute right plantaris muscle rupture. (R. at 418.) He was given crutches and was advised to elevate and ice his leg and to follow up with an orthopedic consultation in one to two days. (R. at 418, 422.) Slayton was prescribed Lortab. (R. at 418.)

-6-

From March 4, 2004, through May 27, 2004, Slayton was described as alert and fully oriented, and his motor and sensory functioning was grossly intact. (R. at 404-07.) Pain was noted on palpation of the lumbar paravertebrals, and Slayton exhibited pain in the left elbow. (R. at 404-07.) Slayton was diagnosed with low back pain, left elbow pain, insomnia, major depressive disorder and generalized anxiety disorder. (R. at 404-07.) Dr. Schultz prescribed various medications, including Sonata, Norflex, Proventil, Aerobid and Lortab. (R. at 404-07.)

On June 15, 2004, Dr. D. Gary Parrish, M.D., a state agency physician, completed a physical assessment, indicating that Slayton could perform medium work. (R. at 423-30.) Dr. Parrish further found that Slayton could frequently climb ramps and stairs, never climb ladders, ropes or scaffolds, but occasionally balance, stoop, kneel, crouch and crawl. (R. at 425.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 426-27.) Dr. Parrish found Slayton's subjective allegations minimally credible. (R. at 428.) Dr. Parrish's findings were affirmed by Dr. F.M. Johnson, M.D., another state agency physician, on October 5, 2004. (R. at 430.)

On July 14, 2004, Slayton was seen at Frontier Health for an initial intake for outpatient admission. (R. at 453-62.) He reported anxiety problems secondary to the traumatic experience of a work injury and witnessing a murder. (R. at 453.) He reported a depressed mood related to his disability and associated restrictions. (R. at 453.) Slayton reported having received counseling in the past, which helped his condition. (R. at 454.) He stated that he took care of animals and performed various activities around his house. (R. at 456.) Slayton reported fishing and playing cards. (R. at 456.) He noted moderate decrease in energy, moderate academic or work

-7-

inhibition, moderate jitteriness, moderate worrying, a moderately blunted or flat affect, a moderately depressed mood, mild helplessness, mild hopelessness, moderate loss of interest or pleasure and moderate insomnia. (R. at 457-59.)

On July 22, 2004, Slayton rated his back pain as a seven on a 10-point scale. (R. at 403.) Dr. Schultz planned to obtain more x-rays, noting that if the findings did not verify Slayton's then-current medication regimen, those medications would be reduced. (R. at 403.) Physical examination showed that Slayton was alert and fully oriented, and his motor and sensory functions were grossly intact. (R. at 403.) He exhibited pain on palpation of the lumbar paravertebral muscles, as well as left elbow pain. (R. at 403.) In addition to his previous diagnoses, Dr. Schultz added left elbow pain. (R. at 403.) Dr. Schultz ordered a drug screen, but prescribed Lortab and Xanax. (R. at 403.) X-rays of the lumbar spine and left elbow also were ordered, and Slayton was referred for counseling. (R. at 403.)

On July 30, 2004, Ralph Ott, a licensed professional counselor, diagnosed Slayton with post-traumatic stress disorder, ("PTSD"), and antisocial personality disorder. (R. at 452.) On August 11, 2004, Slayton reported a history of anxiety and depression. (R. at 446.) He further reported having been diagnosed with PTSD as a result of witnessing a murder in 1988. (R. at 446.) Slayton's mood was described as serious, with a restricted range of affect. (R. at 446.) Attention, memory and thought processes were intact, and no past or present suicidal or homicidal ideation was indicated. (R. at 446.) Slayton was diagnosed with depressive disorder and alcohol dependence. (R. at 447.) He was assessed a GAF score of 55. (R. at 446-47, 449.)

-8-

On August 16, 2004, Slayton presented to the emergency department at Lee Regional Medical Center with complaints of exacerbation of low back pain with radiation down the left leg after twisting his back the day before when he was thrown out of a boat. (R. at 463-70.) An x-ray revealed an old mild L1 compression fracture and degenerative change in the D12 and L1 areas of the spine. (R. at 411.) The x-ray also showed minimal degenerative change at the L3 to L4 level of the spine. (R. at 411.) Slayton was diagnosed with acute myofascial strain and was advised to follow up with his family doctor if his symptoms worsened or failed to improve. (R. at 470.) He was prescribed Valium and Vicoprofen. (R. at 470.) An x-ray of the left elbow, taken on August 19, 2004, showed early stages of degenerative change with a very small osteophyte arising from the olecranon process. (R. at 409.) An x-ray of the lumbar spine showed a mild old compression of the L1 and degenerative change in the lower thoracic and upper lumbar areas of the spine. (R. at 410.) It further revealed mild degenerative change at the L3 and L4 area of the spine. (R. at 410.) No acute compression was noted. (R. at 410.)

On September 13, 2004, Ott diagnosed Slayton as suffering from a depressive disorder and alcohol dependence, with a GAF score of 55. (R. at 445.) On October 5, 2004, R.J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Slayton suffered from a nonsevere affective disorder, anxiety-related disorder and substance addiction disorder. (R. at 471-84.) Milan found that Slayton was not restricted in his activities of daily living, experienced no difficulties in maintaining social functioning, experienced mild difficulties maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 481.) Milan concluded that the medical evidence of record did not reveal serious mental status abnormalities or functional limitations

associated with Slayton's mental symptoms. (R. at 483.) He found Slayton's mental allegations only partially credible. (R. at 483.)

On October 24, 2004, Slayton stated that Xanax helped his anxiety. (R. at 402.) He was diagnosed with low back pain, depressive disorder, insomnia and left elbow pain. (R. at 402.) He was prescribed Lortab and Xanax. (R. at 402.)

On January 4, 2005, Slayton presented to the emergency department at Lee Regional Medical Center with complaints of low back pain since the previous day after carrying numerous five-gallon buckets of water. (R. at 485-92.) He was diagnosed with lumbar strain and was prescribed Norflex, Tramadol and Robaxin. (R. at 492.)

On July 14, 2004, Karen Schooler, B.A., with Frontier Health, diagnosed Slayton with PTSD, antisocial personality disorder and a then-current GAF score of 50. (R. at 515.) On December 1, 2004, Slayton reported being very depressed and anxious due to his physical condition and post trauma. (R. at 512.) Schooler diagnosed depressive disorder, alcohol dependence and a then-current GAF score of 55. (R. at 512.) On December 7, 2004, Slayton continued to complain of anxiety. (R. at 511.) However, he noted that he was not taking any medications at that time. (R. at 511.) He reported experiencing continuing dreams about a murder he witnessed several years prior. (R. at 511.) Schooler described Slayton's affect as euthymic and his mood as tense and anxious. (R. at 511.) Schooler diagnosed depressive disorder and alcohol dependence and assessed Slayton's then-current GAF score at 55. (R. at 510-11.) On December 17, 2004, Slayton reported doing well. (R. at 509.) Schooler described Slayton's affect as euthymic with a congruent mood. (R. at 509.) He was

given a one-week trial of Cymbalta and a prescription for Amitryptiline. (R. at 509.) He was diagnosed with depressive disorder and alcohol dependence and a then-current GAF score of 55. (R. at 509.) On December 28, 2004, Slayton called and informed Schooler that he could not tolerate the Cymbalta. (R. at 507.) On January 10, 2005, Slayton stated that he would like to try a different medication, suggesting Lexapro. (R. at 506.) Slayton did not keep his appointment on January 20, 2005. (R. at 505.) On February 18, 2005, Slayton reported being very nervous and tense. (R. at 502.) He stated that he was experiencing difficulty sleeping and decreased appetite. (R. at 502.) He further reported becoming easily angered. (R. at 502, 554.) Slayton verbalized anger toward his primary care physician who wanted to refer him to a methadone clinic. (R. at 502.) Slayton stated that he was not a drug user. (R. at 502.) Schooler described Slayton's affect as somewhat angry and mad with a congruent mood. (R. at 502.) Dr. Zafar Ahsan, M.D., a psychiatrist, noted that Slayton admitted depression, but denied thoughts of self-harm or of harming others. (R. at 554.) Dr. Ahsan noted that Slayton's mood was mildly anxious with a congruent affect. (R. at 554.) Dr. Ahsan diagnosed depressive disorder, not otherwise specified, anxiety disorder, not otherwise specified, alcohol dependence, in remission, and nicotine dependence. (R. at 554.) Slayton was prescribed Vistaril. (R. at 502, 554.) Dr. Ahsan opined that Slayton was seeking benzodiazepines. (R. at 554.)

Slayton saw Robert S. Spangler, Ed.D., a licensed psychologist, on March 30, 2005, for a psychological evaluation at his attorney's request. (R. at 516-22.) Spangler noted that Slayton seemed socially confident, but anxious and depressed. (R. at 516.) He generally understood instructions, but demonstrated erratic concentration secondary to anxiety, depression and discomfort. (R. at 516.) Spangler noted that he was appropriately persistent on tasks, but his pace was impacted by his

-11-

need to take breaks between tasks. (R. at 516.) Slayton reported having experienced classic depressive and anxiety symptoms for years. (R. at 517.) He reported chronic worry to an unrealistic extent about major life functions. (R. at 517.) He admitted crying when no one was around. (R. at 517.) Slayton reported that he was then-currently taking Vistaril, and had prescriptions for other "nerve medicine," but could not afford it. (R. at 517.)

Spangler reported that Slayton was alert and fully oriented with adequate recall of remote and recent events. (R. at 517.) He was anxious and depressed. (R. at 517.) Spangler opined that Slayton was of low average to average intelligence. (R. at 518.) Slayton denied suicidal or homicidal ideations and hallucinations. (R. at 518.) Delusional thought was not evident, and there were no indications of malingering. (R. at 518.) Spangler deemed Slayton's social skills as adequate, noting that Slayton related well to him. (R. at 518.) Spangler opined that Slayton had the judgment necessary to handle his financial affairs. (R. at 518.) Spangler administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), the results of which were deemed a valid and reliable estimate of Slayton's abilities. (R. at 519.) Slayton obtained a verbal IQ score of 90, a performance IQ score of 86 and a full-scale IQ score of 88, placing him in the low average range of intelligence. (R. at 519.) Spangler also administered the Wide Range Achievement Test-Third Edition, ("WRAT-3"), the results of which were consistent with the WAIS-III. (R. at 519.) Slayton's reading achievement was measured at the post-high school level, while his arithmetic achievement was at the sixth-grade level. (R. at 519.) Spangler noted that Slayton would require more break time than allowed in competitive employment. (R. at 519.)

-12-

Spangler diagnosed Slayton with major depressive disorder, recurrent, mild, generalized anxiety disorder, moderate, alcohol dependence in early remission, polysubstance abuse in full remission, low average intelligence, marginal education math skills, mild erratic concentration and a then-current GAF score of 55. (R. at 519-20.)

Spangler also completed a mental assessment, finding that Slayton had a good ability to follow work rules, to use judgment, to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 523-25.) He found that Slayton had between a fair and a good ability to interact with supervisors, to maintain attention and concentration, to understand, remember and carry out detailed and complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 523-24.) He found that Slayton had a fair ability to relate to co-workers and to deal with work stresses and a poor or no ability to deal with the public and to demonstrate reliability. (R. at 523-24.) Spangler opined that Slayton would miss more than two days of work monthly. (R. at 525.)

On April 11, 2005, Slayton saw Dr. William McIlwain, M.D., with complaints of lumbar pain. (R. at 556-58.) Slayton denied problems with his bowel or bladder. (R. at 556.) He indicated that he could not sit long due to pain. (R. at 556.) Dr. McIlwain noted that Slayton "move[d] very well around the office with no limping nor evidence of antalgic gait." (R. at 557.) On right lateral bend, Slayton complained of pain on the left. (R. at 557.) He was able to extend 20 to 25 degrees with left thigh pain. (R. at 557.) Slayton could flex 60 degrees with a level pelvis. (R. at 557.) Dr. McIlwain noted that Slayton's left arm and hand were weaker than the right. (R. at

557.)  Although a nerve conduction study was ordered, Slayton never underwent the procedure.  (R. at 557.)  Straight leg raising was 90 degrees and equal bilaterally with no significant pain.  (R. at 557.)  Slayton exhibited a full range of motion of the lumbar spine.  (R. at 558.)  Dr. McIlwain recommended that Slayton begin a work hardening program followed by a functional capacity evaluation.  (R. at 557.)  Dr. McIlwain noted that he did not find a lot of limiting findings on the evaluation.  (R. at 557.)  He further noted that Slayton had a lot of subjective complaints, but he moved around well and did not show a significant degree of abnormality.  (R. at 557.)

On April 30, 2005, Slayton presented to the emergency department at Lee Regional Medical Center with complaints of low back and left shoulder pain after lifting a refrigerator.  (R. at 574-80.)  Slayton was diagnosed with low back pain and left shoulder pain.  (R. at 576.)  He was given Soma, Demerol and Vistaril and was advised to use a heating pad.  (R. at 576-77.)  Slayton again presented to the emergency department at Lee Regional Medical Center on May 30, 2005, with complaints of left shoulder pain after lifting a lawn mower.  (R. at 569-73.)  He was diagnosed with musculoligamentous strain of the left shoulder.  (R. at 573.)  Slayton was given Demerol and Vistaril.  (R. at 570.)  He was advised to ice his shoulder.  (R. at 573.)  He returned the following day with continued complaints of pain.  (R. at 565-68.)  He was again diagnosed with musculoskeletal pain of the left shoulder, in addition to anxiety.  (R. at 568.)  Slayton was prescribed Vistaril.  (R. at 568.)  Slayton returned on August 22, 2005, with complaints of pain in the right upper arm after he was hit with a pipe from a lawn mower after "burning off a trailer."  (R. at 559-64.)  An x-ray of the right elbow and arm, taken on August 22, 2005, showed no fracture and only minimal degenerative joint disease.  (R. at 564.)  He was diagnosed with a contusion of the right upper arm, which was placed in a sling.  (R. at 561, 563.)

-14-

Slayton was prescribed Anaprox and Lortab.  (R. at 561.)

Slayton saw Dr. Larry Hartman, M.D., a neurosurgeon, on May 3, 2005, with complaints of back and left leg pain.  (R. at 527-29.)  Slayton reported numbness in the left leg extending to the knee.  (R. at 527.)  He reported that sitting and walking exacerbated his pain.  (R. at 527.)  Slayton further reported intermittent numbness in both hands, as well as shoulder pain.  (R. at 527.)  Slayton stated that he was not taking prescription medication for these problems, but only Goody's powders.  (R. at 527.)  Slayton denied depression, anxiety, nervousness and hallucinations.  (R. at 528.)  Dr. Hartman noted that Slayton was in no acute distress.  (R. at 528.)  Physical examination revealed a diminished range of motion of the lumbar spine.  (R. at 528.)  Straight leg raising was negative bilaterally, but limited to 80 degrees.  (R. at 528.)  He exhibited a positive femoral stretch on the left.  (R. at 528.)  No atrophy, cyanosis or ecchymosis of the extremities was noted.  (R. at 528.)  Dr. Hartman noted that Slayton was alert, oriented and fully cooperative.  (R. at 528.)  Cranial nerves were intact, and deep tendon reflexes suggested a mild depression of the left patellar tendon reflex as compared to the right.  (R. at 528.)  Achilles' tendon reflexes were intact and symmetric.  (R. at 528.)  Motor examination revealed a little give away weakness secondary to pain, but Dr. Hartman noted that it might be real involving the left quadriceps and iliopsoas.  (R. at 528-29.)  Sensory examination revealed a broad band of hypalgesia[8] extending from the left knee and just above medially to the iliac crest laterally and extending across the buttock.  (R. at 529.)

---

[8]Hypalgesia refers to a diminished sensitivity to pain.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 790 (27th ed. 1988).

Dr. Hartman reviewed an MRI of the lumbar spine taken shortly after Slayton's injury, noting that it revealed flexion deformity of the L1 vertebral body. (R. at 529.) However, he noted that there did not appear to be any nerve root encroachment. (R. at 529.) Dr. Hartman diagnosed back and left thigh pain with sensory deficit and perhaps reflex and motor changes, as well as the suggestion of an upper lumbar radiculopathy, broadly compatible with an L2 deficit. (R. at 529.) He noted no indication for surgical intervention, but further noted that he had no recent imaging to review. (R. at 529.) Dr. Hartman prescribed a Medrol dosepak and ordered an MRI of the lumbar spine. (R. at 529.) He opined that Slayton was unable to work at that time. (R. at 529.)

On May 17, 2005, Slayton underwent another MRI of the lumbar spine. (R. at 530-33.) The MRI showed mild degenerative disc changes of multiple lumbar discs, a very tiny herniation of the nucleus laterally on the right side at the L5-S1 level, arthritic changes of facet joints at the L3-L4 and L4-L5 levels and minimal anterior wedging of the L1 vertebral body, likely due to an old injury. (R. at 531-32.) On May 19, 2005, Slayton reported no relief from the Medrol dosepak. (R. at 581.) Physical examination revealed an antalgic gait and a fair amount of dystonic movement.[9] (R. at 581.) Dr. Hartman noted that Slayton continued to have a diminished range of motion of the lumbar spine. (R. at 581.) However, straight leg raising was negative bilaterally. (R. at 581.) Deep tendon reflexes were intact and symmetric in the lower extremities, and Slayton demonstrated some give away weakness of the left quadriceps secondary to pain. (R. at 581.) Slayton's sensory examination revealed a large area of hypalgesia affecting virtually the entire left side circumferentially. (R.

---

[9]Dystonia is a disordered tonicity of muscle. *See* Dorland's at 521.

at 581.)  Dr. Hartman noted that the most recent MRI revealed no significant abnormalities, stating that the disc spaces were well hydrated, and that there was a very tiny midline protrusion at the L5-S1 level of no clinical significance.  (R. at 581.)  Dr. Hartman diagnosed chronic lumbar myofascial pain with a nonanatomic sensory deficit affecting the left lower extremity.  (R. at 581.)  He found no indication for surgical intervention, and recommended that Slayton be referred to pain management.  (R. at 581.)  Dr. Hartman ordered an electromyogram, ("EMG"), and nerve conduction study of the left lower extremity.  (R. at 581.)

On June 9, 2005, Slayton called Schooler informing her that he was feeling increasingly depressed and anxious and that a psychiatrist had informed him that he needed to be on Xanax or Valium.  (R. at 553.)  He stated that he was unable to take Vistaril because it gave him "bad nightmares."  (R. at 553.)  On June 15, 2005, Slayton informed Dr. Ahsan that he really needed something for his nerves.  (R. at 551.)  He stated that he was very depressed.  (R. at 551.)  Slayton reported that he was anxious a great deal and had previously been maintained on Xanax and Valium,[10] but that no one there was willing to treat him appropriately.  (R. at 551.)  He stated that the medications prescribed did not help his condition.  (R. at 551.)  Dr. Ahsan discussed the use of Xanax XR conditioned upon a clean urine drug screen and upon Slayton's willingness to accept therapy.  (R. at 551.)  Slayton described his energy as fair and his sleeping as poor.  (R. at 551.)  He denied hallucinations, delusions or paranoia.  (R. at 551.)  He also denied suicidal or homicidal ideations.  (R. at 551.)  Dr. Ahsan described Slayton as alert and fully oriented, cooperative, attentive and

---

[10]Slayton stated that his former doctor, who had since died, had prescribed Xanax and Valium for him.  (R. at 551.)

calm. (R. at 551.) Speech and thought processes were logical, coherent and goal-directed. (R. at 551.) Slayton's mood was mildly dysphoric with a congruent affect. (R. at 551.) No medication changes were made at that time. (R. at 551.) On June 22, 2005, Slayton appeared, unannounced, demanding to see his case manager and to obtain a prescription for Xanax XR. (R. at 549.) However, Dr. Ahsan had reviewed Slayton's psychological evaluation and, because Slayton had not been entirely truthful about his consumption of alcohol, Dr. Ahsan did not approve his request for Xanax XR. (R. at 549.) On June 27, 2005, Slayton saw Constance Douglas, A.P.R.N., with reports of anxiety, irritability and mood swings. (R. at 544.) Slayton reported family tensions, and agreed to begin therapy sessions. (R. at 544.) He described his energy as good, his sleeping as fair, and he stated that he was eating well. (R. at 544.) He denied hallucinations, delusions or paranoia. (R. at 544.) Douglas noted that Slayton was alert and fully oriented, cooperative, attentive and mildly agitated. (R. at 544.) His speech and thought processes were logical, coherent and goal-directed. (R. at 544.) Slayton was described as somewhat dysphoric, irritated and anxious. (R. at 544.) Douglas prescribed Xanax XR, and Slayton was scheduled to begin individual therapy. (R. at 544.) He was again diagnosed with depressive disorder, alcohol dependence and a then-current GAF score of 55. (R. at 544.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed

-18-

impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 1, 2005, the ALJ denied Slayton's claim. (R. at 14-22.) The ALJ found that the medical evidence established that Slayton had severe impairments, namely low back pain, history of L1 compression fracture, degenerative changes of the thoracic and lumbar spines and an emotional disorder with a GAF score of 55, but he found that Slayton did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19, 21.) The ALJ found that Slayton had the residual functional capacity to perform medium work. (R. at 22.) Thus, the ALJ found that Slayton could return to his past relevant work as a waterproofing worker, a painter and a warehouseman. (R. at 22.) Therefore, the ALJ concluded that Slayton was not under a disability as defined in the Act, and that he was not eligible for SSI benefits. (R. at

-19-

22.) *See* 20 C.F.R. § 416.920(f) (2007).

In his brief, Slayton argues that the ALJ erred by improperly determining both his physical residual functional capacity and his mental residual functional capacity. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 7-12.) Slayton also argues that the ALJ erred by failing to give full consideration to the findings of psychologist Spangler. (Plaintiff's Brief at 12-14.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

-20-

Based on my review of the evidence, I find that substantial evidence exists in this record to support the ALJ's finding that Slayton retained the physical functional capacity to perform medium work. I first note that objective testing and physical examinations conducted by several medical sources revealed only mild symptoms during the time period relevant to Slayton's current claim. For instance, physical examinations consistently revealed intact motor and sensory functioning. (R. at 403-06, 408.) Moreover, diagnostic testing revealed only an old L1 compression fracture and mild degenerative changes at the L3-L4 level of the spine. (R. at 410, 529, 531-32, 564.) No acute compression or nerve root encroachment was noted. (R. at 410.) Furthermore, physical examinations revealed only tenderness to palpation of the lumbar paravertebrals. (R. at 404-07.) In May 2005, Slayton did exhibit a diminished range of motion of the lumbar spine, a positive femoral stretch on the left, a mild depression of the left patellar tendon reflex as compared to the right, a little give away weakness secondary to pain and a broad band of hypalgesia extending from the left knee and just above medially to the iliac crest laterally and extending across the buttock. (R. at 527-29.) However, Slayton reported that he was taking no prescription medication at that time. (R. at 527.) Moreover, despite these findings, straight leg raising was negative bilaterally, cranial nerves were intact and Achilles' tendon reflexes were intact and symmetric. (R. at 528.) Dr. Hartman noted no indication for surgical intervention, but opined that Slayton could not work at that time, mainly due to a lack of recent diagnostic studies for his review. (R. at 529.) However, after reviewing an MRI of the lumbar spine conducted on May 17, 2005, Dr. Hartman noted that no significant abnormalities were present and that surgical intervention was not indicated. (R. at 581.) Instead, he recommended a referral to a pain management specialist, and he ordered an EMG and nerve conduction study of the left lower

-21-

extremity, which Slayton apparently never underwent. (R. at 581.)

The ALJ's physical residual functional capacity finding is further supported by many of Slayton's emergency room visits. The record contains numerous visits to the emergency room for complaints of back pain and shoulder pain, resulting from the performance of various activities, including lifting a refrigerator, being thrown out of a boat, carrying numerous five-gallon buckets of water, lifting a lawn mower, and being struck in the arm by a metal pipe from a lawn mower after "burning off a trailer." (R. at 463-70, 485-92, 569-73, 574-80.) Such activities could not be performed by a physically disabled individual, and are, instead, consistent with an ability to perform medium work.

The ALJ's physical residual functional capacity finding is further supported by the findings of the state agency physicians. (R. at 423-30.) Specifically, Drs. Parrish and Johnson concluded that Slayton could perform medium work. (R. at 424.) They imposed no manipulative, visual, communicative or environmental limitations. (R. at 426-27.) Additionally, I find that Slayton's reported activities of daily living are not inconsistent with an individual capable of performing the physical demands of medium work. For instance, Slayton reported caring for pets, performing various household activities, including occasional vacuuming and preparing simple meals daily, fishing, watching television, sitting on his porch and playing cards. (R. at 104-10, 456.) Finally, I note that the ALJ's physical residual functional capacity finding is supported by Dr. McIlwain's findings. Dr. McIlwain noted that Slayton was able to move around his office very well without limping or evidence of antalgic gait. (R. at 557.) Straight leg raising was 90 degrees and equal bilaterally with no significant pain. (R. at 557.) Slayton exhibited full range of motion of the lumbar spine. (R. at

558.) Dr. McIlwain recommended that Slayton begin a work hardening program, and he stated that he did not find a lot of limiting findings on the evaluation, and that despite Slayton's numerous subjective complaints, he moved around very well and did not show a significant degree of abnormality. (R. at 557.)

For all of these reasons, I find that substantial evidence supports the ALJ's finding that Slayton retained the physical functional capacity to perform medium work. Slayton also argues that the ALJ erred in his mental residual functional capacity finding, noting specifically that the ALJ erred by rejecting the findings of psychologist Spangler. However, for all of the following reasons, I find that substantial evidence supports the ALJ's decisions in these regards as well.

The ALJ found that Slayton had the mental residual functional capacity for work not inconsistent with an emotional disorder resulting in a GAF score of 55. (R. at 22.) The ALJ rejected psychologist Spangler's mental assessment because it was inconsistent with his own narrative report which specified that Slayton suffered from *mild* depression and with the treatment notes provided by Slayton's treating physician. (R. at 19.) I find that substantial evidence supports such a rejection. In a mental assessment completed in March 2005, psychologist Spangler found, among other things, that Slayton had a fair ability to relate to co-workers and to deal with work stresses and a poor or no ability to deal with the public and to demonstrate reliability. (R. at 523-25.) Spangler opined that Slayton would miss more than two days of work monthly. (R. at 525.) However, in his narrative report completed the same day, Spangler described Slayton as "socially confident." (R. at 518.) He also deemed Slayton's social skills to be adequate, noting that Slayton related well to him. (R. at 518.) Slayton obtained a verbal IQ score of 90, a performance IQ score of 86 and a

-23-

full-scale IQ score of 88, placing him in the low average range of intelligence. (R. at 519.) Spangler diagnosed Slayton with only mild depressive disorder, moderate generalized anxiety disorder and a then-current GAF score of 55. (R. at 519-20.) Thus, as the ALJ noted, Spangler's narrative is inconsistent with the findings contained in the mental assessment. For the following reasons, it also is inconsistent with other evidence in the record.

There is nothing in the treatment notes of Slayton's treating physician, Dr. Schultz, to indicate such restrictions. In fact, although Dr. Schultz diagnosed Slayton with major depressive disorder and generalized anxiety disorder and prescribed Xanax, there is nothing contained in the treatment notes detailing why such diagnoses were made. It does not appear that Slayton even complained of depression or anxiety to Dr. Schultz during the time period relevant to this court's decision.

Additionally, I find that Spangler's assessment is contradicted by state agency psychologist Milan's findings. Specifically, Milan found that Slayton was not restricted in his activities of daily living, experienced no difficulties maintaining social functioning, experienced only mild difficulties maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 481.) Milan concluded that the medical evidence of record did not reveal serious mental status abnormalities or functional limitations associated with his mental symptoms. (R. at 483.) Lastly, I note that Slayton did not consider his mental impairments disabling when he filed the SSI claim currently before the court, and in May 2005, he denied depression, anxiety or nervousness, among other things. (R. at 528.)

The record currently before the court simply reveals that Slayton was repeatedly

diagnosed with a depressive disorder, an anxiety disorder, alcohol dependence and a GAF score of 55. (R. at 407, 408, 445, 447, 449.) He has been prescribed various medications, including Elavil, Xanax, Cymbalta, Amitriptyline and Vistaril. (R. at 402-03, 509, 517.) In July 2004, Slayton reported that counseling had helped his condition in the past. (R. at 454.) He also stated in October 2004, that Xanax helped his anxiety. (R. at 402.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Moreover, despite his various diagnoses, mental health sources have placed minimal restrictions on his abilities. For instance, Slayton has consistently been described as alert and fully oriented. (R. at 403-04, 406-08.) In August 2004, it was noted that his memory and thought processes were intact. (R. at 446.) As noted above, state agency psychologist Milan imposed very minimal restrictions as well. The remainder of the record, as it pertains to Slayton's mental impairments, consists mostly of subjective allegations by Slayton. Thus, for all of these reasons, I find that substantial evidence supports the ALJ's finding that Slayton had the mental residual functional capacity to perform jobs not inconsistent with an emotional disorder resulting in a GAF score of 55.

### III. Conclusion

For the foregoing reasons, Slayton's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed. I further deny Slayton's request to present oral argument based on my finding that it is not necessary in that the parties have more than adequately addressed the relevant issues in their written arguments.

An appropriate order will be entered.

DATED:     This 28th day of September 2007.

/s/   *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE